OKLAHOMA CITY NEWS BROADCAST-
ERS ASSOCIATION, INC., an Oklaho-
ma nonprofit corporation, Society of
Professional Journalists—Sigma Delta
Chi, Inc., an Oklahoma nonprofit cor-
poration, Sam Moore, Mike Carrier,
and Terri Watkins, Petitioners,

v.

Honorable George NIGH, Governor of the
State of Oklahoma, Honorable Mike
Turpen, Attorney General of the State
of Oklahoma, and Honorable Clifton H.
Scott, Auditor-Inspector of the State of
Oklahoma, Respondents.

No. 61945.

Supreme Court of Oklahoma.

May 29, 1984.

Arthur R. Angel, Oklahoma City, for petitioners.

Michael C. Turpen, Atty. Gen., Neal Leader, Asst. Atty. Gen., Deputy Chief, Civil Div., Oklahoma City, for respondents.

LAVENDER, Justice:

Petitioners seek assumption of original jurisdiction and issuance of a writ of mandamus:

1. To compel the Governor of the State of Oklahoma to make records in his possession or under his control pertaining to disposition of moneys appropriated by the Legislature to the Governor for the Governor's "mansion account" available to Petitioners for inspection and copying.

2. To compel the Attorney General of Oklahoma to withdraw and declare invalid Attorney General Opinion 83–18, to give full legal effect to the provisions of the Open Records Act, and to conduct a review of the legality of mansion account expenditures after an audit report by the Auditor-Inspector of the State of Oklahoma.

3. To compel the Auditor-Inspector of the State of Oklahoma to promptly make an audit of the mansion account expenditures for 1982 and 1983, to furnish a report of the same to the Attorney General, and to promptly prepare and make publicly available a report of the 1983 expenditures.

Central to the matter before us are the Open Records Law, 51 O.S.1981, § 24; the Mansion Account Law, 74 O.S.1981, § 7; the legislative appropriation of $40,000 for the support and maintenance of the Governor's Mansion for the fiscal year ending June 30, 1983, 1982 Okla.Sess.Laws, c. 207, § 1; and the amendment to 74 O.S.1981, § 7 by 74 O.S.1983 Supp. § 7, effective June 30, 1983.

The Open Records Law (51 O.S.1981, § 24) provides:

"It is hereby made the duty of every public official of the State of Oklahoma, and of its sub-divisions, who are required by law to keep public records pertaining to their said offices, to keep the same open for public inspection for proper purposes, at proper times and in proper manner, to the citizens and taxpayers of this State, and its subdivisions, during all business hours of the day; provided, however, the provisions of this act shall not apply to Income Tax Returns filed with the Oklahoma Tax Commission, or

other records required by law to be kept secret."

The Mansion Account Law (74 O.S.1981, § 7) provides:

"The Governor of the State of Oklahoma is hereby authorized, at the expense of the State, and within the limitations hereinafter made, to maintain in such manner as the Governor deems necessary and appropriate, the mansion provided for his occupancy by the State of Oklahoma and to pay all expenses connected with said occupancy. That the expense of the occupancy and upkeep of said Governor's Mansion shall be the sum of Five Hundred ($500.00) Dollars, per month, and shall be paid monthly upon a claim approved by the Governor of Oklahoma."

The Amendment to the Mansion Account Law (74 O.S.1983 Supp. § 7) provides:

"The Governor of the State of Oklahoma is hereby authorized, at the expense of the state, and within the limitations of the appropriation authorized below, to maintain in such manner as the Governor deems necessary and appropriate, the mansion provide for his occupancy by the State of Oklahoma and to pay all expenses connected with such occupancy. Such expenses shall include, food, entertainment and such other expenditures as would be necessary and proper for the Governor, his family and his guests when the duties of the Office of Governor dictate such expenditures. The expense of the occupancy and upkeep of said Governor's Mansion shall be from funds appropriated annually by the Legislature from the General Revenue Fund for such purposes, provided that any such funds appropriated which remain at the end of the fiscal year shall be redeposited in the General Revenue Fund. The funds shall be paid monthly upon a claim approved by the Governor of Oklahoma. The Governor shall deposit such funds in a separate account and shall keep a separate record of all expenditures. At the end of the fiscal year, the Governor shall submit an itemized report, or final accounting, of such expenditures to the State Auditor and Inspector. Such report shall be a public record and shall be made available for inspection upon demand."

The Affidavit of Sam Moore, board member of the Oklahoma City News Broadcasters Association, Inc., vice president of the Oklahoma Chapter of the Society of Professional Journalists—Sigma Delta Chi and news reporter asserts that the Governor refused to make his records of expenditures of the Mansion Fund available for inspection on November 10, 1982. Other affidavits of news reporters indicate a similar refusal during October, 1982.

By Affidavit, Governor George Nigh asserts that he had been advised by various State officials that he was not required to make, keep or file records of itemized expenditures in making claims to the Legislatively appropriated Mansion Account, that such records as he kept pertaining to said expenditures were made only for the purpose of using them for personal income tax purposes, and that such records were not kept in conjunction or connection with the performance or transaction of any of his official duties as Governor or business of his office.

I.

■ Our initial inquiry is whether the Governor's records pertaining to his expenditure of the Legislatively appropriated funds for the Mansion Account constitute records pertaining to the office of the Governor which are required by law to be kept within the meaning of the Open Records Act (51 O.S.1981, § 24). We answer in the negative as to 74 O.S.1981, § 7. It follows, therefore, that the Governor is not required to keep the same open for public inspection.

■ At the outset, we observe that 74 O.S.1981, § 7 neither requires keeping of records of the Governor's expenditures, nor any accounting for the expenditure of the Legislatively appropriated fund. We further observe that the Governor is authorized to "maintain (the mansion) in such manner as the Governor deems necessary and appropriate, ... and to pay all expenses

connected with said occupancy." Our task is to determine the intent of the Legislature. *State ex rel. Cartwright v. Georgia-Pacific Corp.*, Okl., 663 P.2d 718 (1982). From the clear language of the statute, it is plain that the Legislature intended to appropriate for the Mansion Account a fixed sum which the Legislature estimates to be equal to or less than the anticipated expense to the Governor in connection with his occupancy of the mansion.

In *Eberle v. Nielson*, 78 Idaho 572, 306 P.2d 1083 (1957), the Idaho Court had before it the consideration of similar Legislative appropriations. As against the contention that such appropriations might exceed the actual expense and thus constitute an unlawful increase in the statutory emoluments of office such as an increase in salary, the Court said (306 P.2d 1087):

"We cannot presume that the Legislature intended to circumvent the constitution and to unlawfully augment the per diem of its members. On the contrary, we are required to presume that the Legislature intended to comply with the limitations of the constitution, all presumptions being in favor of the validity of its acts. Further, the burden is on the defendant, in challenging the constitutionality of the act, to show that the allowance is in fact an augmentation of either the per diem or mileage allowed, and thus violative of either or both of those limitations." And 306 P.2d at p. 1088: "The legislators are sworn constitutional officers of the state. It is not to be assumed that they would thus seek to violate the fundamental law. As a body they have broad powers and wide discretion to find and declare facts incident to legislative enactments, and the courts cannot interfere until it is clearly made to appear that the finding or declaration of the Legislature is so unreasonable as to be clearly a violation of the constitutional limitation."

In *Eberle* as here, there was no showing that the appropriation in fact exceeded the lawful expense for which it was made and the Holding of the Idaho Court applies equally to the case at bar.

■ Petitioners' argument that Art. X, § 14 of the Oklahoma Constitution requires that public monies be used for public purposes only and that an appropriation for the Mansion Account contravenes the Constitutional prohibition is answered in *Way v. Grand Lake Ass'n., Inc.*, Okl., 635 P.2d 1010 (1981). We there quoted with approval from *Dixon v. Shaw*, 122 Okl. 211, 253 P. 500 (1927) as follows:

"Governmental ends under our political system, and the method and expenditures, incidental to the proper reaching thereof, are placed in the hands of the sovereign Legislature. It represents the will of the people in a degree no less conclusive than a constitutional convention, in all matters not either expressly or by clear implication prohibited by the basic law of the State. No one can tell such body, or the members thereof, to account for its or their expenditure of public funds, or other matters brought within its control, save and except the people in their sovereign capacity, unless the power of the courts can be invoked to restrain and prevent the completion of a purpose expressed by such body in violation of the basic law of the State.

"What we have just said brings us to the first proposition announced by the plaintiffs, to the effect that the Legislature is sovereign, and has no limitations as to expenditures, either for its own members, or for other departments of state government, save and except where the Constitution of the state or nation has seen fit to place an inhibition. This is so well recognized that it has become all but axiomatic. This court in many cases has clearly enunciated this rule, following both the logic and the reason of all courts of this nation, both state and federal. * * *

"The sovereign speaks through its legislative body, and the legislative body determines the policy of the sovereign which has no limitation as to expenditures, save and except those which are expressly placed on its exercise by the

Constitution of the State." (Citations omitted).

No issue—other than above—as to the constitutionality of the Mansion Account Appropriation statutes has been presented and we decline to treat such issues *sua sponte*. Also this Court is not authorized to express its opinion as to the *wisdom* of those statutes.

We hold that whether such appropriation is for a "public purpose" is for determination by the Legislature unless it is clearly shown to be for a purpose expressed by the Legislature in violation of the Constitution. There has been no showing that maintenance of the state-owned Governor's mansion and the payment of the expense of the Governor's occupancy thereof is not a "public purpose" within the meaning of the Oklahoma Constitution.

Having determined that the Legislative appropriation of the mansion fund is for a public purpose, that the expenditure of said appropriation does not constitute records pertaining to the office of the Governor which are required by law to be kept, and that the Governor is not accountable by law for the expenditure thereof, it follows that refusal by the Governor to keep said expenditure records open for public inspection is not a violation of the Open Records Law.

*State v. Nix,* 195 Okl. 176, 155 P.2d 983 (1945), dealt with county charity claims which were filed in the office of the county clerk. It was assumed that such claims were public records. The opinion in this case is not dispositive here.

*State ex rel. Cartwright v. Oklahoma Industries Authority,* Okl., 629 P.2d 1244 (1981) is distinguishable from the case at bar. There the trust records sought to be inspected were statutorily required to be maintained and to be open to public inspection.

The purpose and intent of the Open Records Law is to permit public inspection "for proper purposes" and during business hours of those records which are required by law to be kept by public officials and which pertain to their offices. The Act does not authorize public inspection of any and all writings made or preserved by public officials. Although similar statutes of other states may be more flexible—such as, for example, the statute of Oregon discussed in *MacEwan v. Holm,* 226 Or. 27, 359 P.2d 413, 85 A.L.R.2d 1086 (1961) and allow public inspection of not only those records which are required by law to be kept by the official but all writings which reflect the actions—or record of actions—of public officials, such is not the case with our Open Records Law (51 O.S.1981, § 24).

In *66 Am Jur 2d Records and Recording Laws,* § 3, it is stated:

"The mere fact that a writing is in the possession of a public officer or public agency does not make it a public record. It is the nature and purpose of the document, not the place where it is kept, which determines its status ..."

Certainly prior to the amendment to 74 O.S.1981, § 7 (74 O.S.1983 Supp., § 7) the Governor was not required to keep a record of his expenditures from the Mansion Account appropriated funds nor to account for the same at the end of the fiscal year for which they were appropriated. The record of such expenditures was not a "public record" required by 51 O.S.1981, § 24 to be kept open for public inspection. Whether such provisions were constitutional is not before us today.

## II.

The 1983 amendment to 74 O.S.1981, § 7 became effective June 30, 1983. The amendment required, among other things, that the Governor deposit the Mansion Account funds in a separate account and also required the Governor to keep a separate record of all expenditures from that account. We are of the view that by these specific provisions it became the Governor's duty to keep a public record of the account and of the expenditures therefrom. Without more it would be clear that such records would be public records under 51 O.S.1981, § 24 and subject to public inspection by virtue thereof. The amendment

however did not stop with requiring the maintenance of a separate account and record of expenditures it also required that all funds not used be returned to the General Revenue Fund and at the end of the fiscal year the Governor shall submit an itemized report of expenditures from the Mansion Account to the State Auditor and Inspector. It was then provided, "Such report shall be a public record and shall be made available for inspection upon demand." We hold that the last quoted provision limits the Mansion Account records subject to The Open Records Law, to the annual report.

■ In the current law there is no legislative requirement of availability for inspection of the day-to-day expenditures from the fund. The Governor's report of mansion account appropriation expenditures is not due until the end of fiscal 1984, and was not yet due when this action was brought. There has been no demand, or refusal to furnish the report or to make it available for inspection, nor could there be until such time as the report is due. There being no refusal to perform a plain legal duty, no writ of mandamus will lie with reference to the amendment.

### III.

■ The Attorney General promulgated Opinion No. 83–18 on May 25, 1983 in the performance of his official duties. The opinion comports with what we have heretofore said with reference to 74 O.S.1981, § 7.

In *Draper v. State*, Okl., 621 P.2d 1142 (1980), this Court said:

"Although a writ of mandamus will lie to compel the Attorney General to perform a plain ministerial duty, it is inappropriate when the Attorney General has performed his duty. The statute, 74 O.S. Supp.1979, § 18b(q) imposes the requirement that the Attorney General answer any question on any subject posed by a member of the Legislature. The attorney General answered the questions. Mandamus will lie to compel the Attorney General to exercise his discretion, but it does not lie to control his action regarding matters within his discretion, unless his discretion has been clearly abused. A difference of opinion is not an abuse of discretion. Where there is room for two opinions, the action is not arbitrary or capricious when it is exercised honestly upon due consideration even though it may be believed that an erroneous conclusion has been reached. Before a writ of mandamus may be issued, there must be: 1) a clear legal right vested in the petitioner; 2) refusal to perform a plain legal duty which does not involve the exercise of discretion, and 3) adequacy of the writ and inadequacy of other relief. Mandamus is an improper remedy."

Here the Attorney General has not only performed the duty enjoined upon him by law, his opinion reached the correct conclusion. Therefore, mandamus will not lie.

### IV.

■ What we have heretofore said disposes of the action sought to be maintained against the Auditor-Inspector. Since the Mansion Account expenditure does not constitute a public record for which the Governor is accountable under 74 O.S.1981, § 7, the Auditor-Inspector has neither the duty nor the right to audit the same as a part of his official duties, and the time for the performance of his official duties with reference to the 1983 amendment thereto has not yet arrived.

APPLICATION TO ASSUME ORIGINAL JURISDICTION AND PETITION FOR ISSUANCE OF A WRIT OF MANDAMUS IS DENIED.

BARNES, C.J., and HODGES, HARGRAVE, WILSON and KAUGER, JJ., concur.

OPALA, J., concurring in result.

DOOLIN, J., dissents in Part II, concurs in all other portions.

OPALA, Justice, concurring in result:

At the center of the controversy sought to be placed before us in this original proceeding for a prerogative writ is the so-called mansion account—a legislatively-fixed stipend authorized by the now-repealed statute[1] for the upkeep and occupancy of the chief executive's official residence. Petitioners seek from this court—by writ of mandamus—a judicial command compelling (a) the disclosure of *all* expenses paid from the allowance received under this statute and (b) the production of *all* underlying documents by which each transaction is reflected.

I concur insofar as the court holds that the mansion account statute petitioners invoke as a basis for the relief sought does not *facially* require records to be kept nor does it create *any* duty to account to the government for any expenses made. Petitioners' argument that by this action they may compel the production of purely *public* records by a government *official* must hence fail. *Simply stated, the writ sought will not lie for discovery of private papers.*

What, then, remains of petitioners' case may be a suit for an accounting and the return of excessive mansion allowance payments to the state treasury. This claim, if indeed actionable, is plainly inappropriate for the exercise of the Supreme Court's original jurisdiction. The theory advanced by the petitioners—that the mansion allowance received may be subject to a judicially-compellable accounting and the return of unexpended or misapplied funds enforced—is founded on the contention that the statute under consideration, 74 O.S.1981 § 7, is a *disguised* salary increase in violation of Art. 23 § 10, Okl. Const. Aside from posing accounting problems, this approach, if correct, would require some exploration of, and inquiry into, the factual foundation that underlies the statutorily-fixed amount determined by the legislature to be necessary for the upkeep and occupancy of the mansion. While petitioners' allegations in the paperwork before us doubtless are sufficient to show their standing to press for the production of *public records* sought by them for inspection, it is far from certain that these petitioners also would have standing to challenge the constitutional validity of the mansion account statute here under consideration and to bring a claim for an accounting ancillary to the recovery of unexpended or misapplied funds. See *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).[2]

I would hence declare this controversy unsuitable for resolution in the exercise of this court's original cognizance.

---

1. 74 O.S.1981 § 7.

2. In a suit for accounting petitioners would occupy the status of so-called "non-Hohfeldian" plaintiffs, i.e. persons whose interest tendered for judicial vindication is neither personal nor proprietary. See *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 1962, 20 L.Ed.2d 947 (1968) (Harlan, J., dissenting).