Cathy ROSS, Mona White, and Russ Burns, Appellants,

v.

H.W. "Pete" PETERS, Michael Weatherly, Becky Thompson, Barbara Barrowman and Robin Quick, Appellees.

No. 76059.

Supreme Court of Oklahoma.

Feb. 9, 1993.

Karen E. Faulk, Lynn B. Mares, Abel, Musser, Sokolosky & Clark, Oklahoma City, for appellants.

Robert H. Henry, Atty. Gen., Neal Leader, Asst. Atty. Gen., Chief, Civil Div., Susan Brimer Loving, Atty. Gen., Dan M. Peters, Asst. Atty. Gen., Oklahoma City, for appellees.

OPALA, Justice.

Two questions are presented on this appeal: (1) Do the terms of 20 O.S.1981 §§ 1501 et seq. authorize the State Board of Examiners of Official Shorthand Reporters to refuse enrollment as a certified shorthand reporter to any person who employs the stenomask method of reporting? and if so, (2) Do these statutes contravene the Oklahoma and U.S. Constitutions? We answer the first question in the affirmative and the second in the negative.

## I

### THE ANATOMY OF LITIGATION

Appellants Cathy Ross, Mona White, and Russ Burns [applicants or Ross, White and Burns] are court reporters who employ the stenomask method of reporting.[1] The ap-

---

1. In response to the Board's motion for summary judgment, the applicants included in the evidentiary material several exhibits from the National Stenomask Verbatim Reporters Association [NSVRA]. According to the NSVRA, the stenomask method of reporting is

 "a closed microphone dictation system which is quiet, accurate and permits the court re-porter to take verbatim testimony at speeds in excess of 250 words per minute, depending upon the reporter's expertise.

 The stenomask consists of a low impedance microphone encased in a sound-proof mask that the reporter lifts to the face. A tape recorder is connected to the stenomask and a verbatim voice record of the proceedings is

pellees are members of the State Board of Examiners of Official Shorthand Reporters [Board], which is responsible for the certification of Oklahoma Certified Shorthand Reporters [CSR] and Oklahoma Licensed Shorthand Reporters [LSR].[2]

The event that precipitated this litigation was the legislature's promulgation of 12 O.S.Supp.1986 § 3205, which then provided

> made. Unlike an open microphone which only records sounds, the stenomask reporter identifies speakers, makes voice notes of time, gestures, describes action such as passing of documents or marking of exhibits, and may add to the recording punctuation, spelling or other directions for transcribing to ensure an accurate record of the proceedings."

2. The terms of 20 O.S.1981 § 1502 provide in part:

> "The Board shall have the following duties:
> a. Conduct preliminary investigations to determine the qualifications of applicants seeking to attain the status of certified shorthand reporters;
> b. Conduct at least once a year ... an examination of those persons who seek to attain the status of certified shorthand reporters. The Board may also give examinations for a certificate of proficiency and for a certificate of merit;
> c. Recommend to the Supreme Court for official enrollment as certified court reporters those persons who, on their examination, have established the requisite proficiency in taking testimony and proceedings and in preparing accurate transcripts thereof;
>
> \* \* \* \* \* \*
>
> e. Adopt, with the approval of the Chief Justice, examination standards and rules governing enrollment, discipline, suspension, cancellation and revocation proceedings and any other matter within the Board's cognizance. \* \* \*"

3. Section 3205 was enacted in 1982 as a part of the Oklahoma Discovery Code, 12 O.S.Supp. 1982 §§ 3201 et seq. The quoted portion of § 3205, which was added in 1986, precipitated this lawsuit. The statute was renumbered in 1989 as 12 O.S.Supp.1989 § 3228 (Okl.Sess.L. 1989, Ch. 129 § 14, eff. Nov. 1, 1989). In 1992 § 3228 was amended to provide for a 30–day period for certain stenomask reporters to be certified as acting court reporters for the sole purpose of taking depositions. (Okl.Sess.L. 1992, Ch. 1, § 6, eff. March 10, 1992). The pertinent terms of the 1992 amendment are:

> "... on and after the effective date of this act, any person who was taking depositions by the stenomask method of reporting within this state prior to January 1, 1990, may continue

in part that "on and after January 1, 1990, depositions taken within this state shall only be taken by an officer who is either a certified shorthand reporter (CSR) or a licensed shorthand reporter (LSR)."[3] Recognizing the probable impact of this statute on their occupation and income, Ross and Burns applied in 1988 and 1989 to take the examination for certification;[4]

> to take depositions within this state if the person provides to the State Board of Examiners of Official Shorthand Reporters or successor entity of the Board a certification, signed by a judge of the district court and by an attorney licensed to practice law in this state, declaring that the person has taken depositions that were admitted into evidence in any court of this state. The certification shall be submitted within thirty (30) days of the effective date of this act to the State Board of Examiners of Official Shorthand Reporters or successor entity of the Board who shall issue said person a certificate as an *acting court reporter* permitting the person *to take depositions or other sworn statements,* subpoena witnesses for depositions, issue affidavits in respect to the regular duties of the person, and administer oaths and affirmations with authority equal to that of a notary public." (Emphasis added.)

Because § 3228's midappeal amendment appeared to have mooted the issues now on appeal, we directed the parties to submit briefs on this issue. The applicants assert that the statute, even if applicable, does not provide them with a status equal to CSR's and LSR's, who, by the terms of 20 O.S.1981 § 106.3B, have preference for employment as official court reporters for the district courts. Section 106.3B(a) provides in pertinent part that "[p]ersons now certified or hereafter certified by the State Board of Examiners of Official Shorthand Reporters shall be given *primary* consideration for appointment" as a court reporter. (Emphasis added.)

4. The terms of 20 O.S.1981 § 1503 provided:

> "a. Every applicant who seeks to be examined for enrollment as a certified shorthand reporter shall prove to the satisfaction of the Board that he is of legal age, meets the requisite standards of ethical fitness and has at least a high school education or its equivalent.
> b. Every applicant for enrollment as a certified shorthand reporter shall be required, on examination, to demonstrate proficiency in reporting testimony and proceedings at a speed of not less than two hundred (200) words per minute in taking a question-and-answer-type dictation only, and no other type, and in preparing an accurate transcription thereof that is reasonably free from spelling errors. Any examination or test given shall be approved by the Supreme Court. The

White, who had been a certified court reporter in Texas, sought reciprocity.[5] The Board denied the applications, finding that the stenomask system was not one of the statutorily accepted methods of demonstrating proficiency in court reporting.

In December of 1989 Ross brought an action for relief under the Uniform Declaratory Judgments Act, 12 O.S.1981 §§ 1651 et seq., to declare whether the Board (a) correctly construed the applicable certification statutes and (b) erred in denying her the opportunity for enrollment as a certified shorthand reporter. After the Board moved for summary judgment, but before discovery, White and Burns were allowed to intervene as additional plaintiffs.[6] They were then instructed to submit briefs in response to the Board's summary judgment quest. The trial court gave summary judgment to the Board,[7] and the applicants appealed. We affirm.

## II

### CONSTRUCTION OF THE CERTIFICATION STATUTES

■ Except for those who receive reciprocity,[8] § 1503(b) requires every applicant for enrollment as a certified shorthand reporter to take an examination in which the applicant must demonstrate a "proficiency in reporting testimony and proceedings."[9] The quoted phrase "means proficiency in verbatim reporting by use of *any generally recognized system of symbols or abbreviations written with pen or pencil, stenotype or similar machines,* or such other method as may be from time to time approved by the Supreme Court." § 1503(c).[10] Taken together, subsections (b) and (c) provide the standard for testing an enrollment quest for CSR and LSR certification.

The applicants contend that the phrase "or similar machines" in § 1503(c) constitutes a clear legislative expression not to foreclose new reporting methodologies, such as the stenomask method of reporting. In support of this position, the applicants argue that 20 O.S.1981 § 106.4(a) constitutes a legislative endorsement of the stenomask method of reporting. Section 106.4(a) provides in part that "[t]he court reporter shall make a full reporting by means of stenographic hand, steno-mask or machine notes, or a combination thereof ... in trials and other judicial proceedings ..." and that "[n]othing herein contained shall be construed to authorize the certification of persons as certified shorthand

---

Board may not increase or decrease such minimum speed requirement, by rule or otherwise.

c. As used in paragraph b hereof, the phrase "proficiency in reporting testimony and proceedings" means proficiency in verbatim reporting by use of any generally recognized system of symbols or abbreviations written with pen or pencil, stenotype or similar machines, or such other method as may be from time to time approved by the Supreme Court." Section 1503 was not substantively changed by the 1992 amendment (Okl.Sess.L.1992, Ch. 1, § 3).

5. The terms of 20 O.S.Supp.1986 § 1504 provide in part:

"The following persons shall be entitled to enrollment as licensed court reporters without examination:

\* \* \* \* \* \*

b. Any person deemed by the Board to hold an equivalent license from another state who is a resident of Oklahoma, provided his credentials are found to be in proper order. \* \* \* "

6. The terms of 12 O.S.Supp.1984 § 2024(B) *authorize the court to allow parties to intervene in an action.*

7. In rendering summary judgment, the trial court found that (1) there was no substantial controversy as to any material fact; (2) under the certification statutes, the stenomask method of reporting was not an accepted method of reporting; (3) the certification statutes do not authorize the certification of stenomask reporters; (4) the Board's construction of the certification statutes was proper; (5) the Board properly denied Ross' and Burns' applications to take the certification examination as well as White's application for a reciprocal certification; and (6) the certification statutes are free from constitutional infirmity.

8. *See supra* note 5 for the pertinent terms of 20 O.S.Supp.1986 § 1504.

9. For the terms of 20 O.S.1981 § 1503(b), see *supra* note 4.

10. 20 O.S.1981 § 1503(c) (emphasis added), *supra* note 4.

reporters *who rely exclusively upon the steno-mask* for reporting judicial proceedings, except as provided by law...."[11] The applicants argue that the Board's construction of the applicable statutes is inconsistent with the statutory scheme because (1) they do not rely *exclusively* upon the stenomask method, but also employ auxiliary backup devices and take supplemental shorthand notes; (2) § 106.4(a) expressly provides that the stenomask method may be employed in the reporting of judicial proceedings; (3) any other interpretation would, on its face, lead to an absurd result; noncertified stenomask reporters would be permitted to employ the stenomask method in judicial proceedings, but not to take depositions; and (4) the phrase in § 1503(c), "or similar machines," reveals legislative intent not to exclude persons who use differing methodologies like the stenomask method. The applicants urge this court not to construe these statutory provisions to produce inconsistent results,[12] but rather to adopt their view by holding that the Board's construction of the certification statutes was improper. *We remain unpersuaded.*

## A.

■ We agree that by including the phrase "or similar machines" the legislature did not intend completely to exclude *all* new court reporting methodologies

from the proficiency standard of § 1503(c). Viewed in the abstract, this statutory phrase can mean only that *some* methods of reporting are permissible and *some* are not. Our inquiry cannot end here.

It is a well-settled principle of statutory construction that, where possible, courts will not construe statutes to reach an absurd or an inconsistent result.[13] An equally well-established rule is that, in order to avoid judicially imposing a different meaning from that the legislature intended, courts will not place a strained construction on the plain words of a statute.[14] The phrase "or similar machines," standing alone, constitutes a nondescript class of reporting methods. That is, the phrase merely identifies one alternative method from among a list of other alternative methods—"pen or pencil, stenotype or similar machines."[15] But once the phrase is anchored in the language of the subsection, the nondescript class of methods is readily narrowed.

Section 1503(c)'s list of specified methods is qualified by the verb form "written."[16] Under a plain-meaning theory of statutory construction,[17] the term "written" is a past participle of the verb "to write,"[18] which itself means "[1] [t]o form (letters, for example) on a surface with a tool such as a pen or pencil.... [2] [t]o form (a word, for example) by inscribing letters or symbols

---

**11.** 20 O.S.1981 § 106.4(a). *The quoted portions were not changed by the 1989 amendment* (Okl. Sess.L.1989, Ch. 39 § 1, eff. Nov. 1, 1989).

**12.** This rule is subsumed within the general principle of *in pari materia,* which is defined as "[o]f the same matter; on the same subject; as, laws *in pari materia* must be construed with reference to each other." BLACK'S LAW DICTIONARY 1004 (5th ed. 1985). *See also Cowart v. Piper Aircraft Corp.,* Okl., 665 P.2d 315, 317 (1983); *Beavin v. State ex rel. Department of Pub. Safety,* Okl., 662 P.2d 299, 302 (1983); *Thornton v. Woodson,* Okl., 570 P.2d 340, 341–342 (1977); *AMF Tubescope Co. v. Hatchel,* Okl., 547 P.2d 374, 379–380 (1976); *Bell v. United Farm Agency,* Okl., 296 P.2d 149, 151–152 (1956).

**13.** *See supra* note 12.

**14.** *Thornton, supra* note 12, 570 P.2d at 341–342; *Wade v. Brown,* Okl., 516 P.2d 526, 528 (1973).

**15.** 20 O.S.Supp.1989 § 1503(c) (emphasis added), *supra* note 4.

**16.** The terms of 20 O.S.1981 § 1503(c), *supra* note 4, provide in pertinent part:

"... *written* with pen or pencil, stenotype or similar machines...." (Emphasis added.)

**17.** It is axiomatic that where the statutory language is plain and unambiguous, there is no room for judicial construction beyond the scope of the plain and unambiguous language. *See Forston v. Heisler,* Okl., 363 P.2d 949, 951 (1961); *Darby v. Oklahoma Tax Commission,* 201 Okl. 159, 202 P.2d 978, 981 (1949); *Protest of Hyde,* 188 Okl. 413, 110 P.2d 292, 293 (1941).

**18.** THE AMERICAN HERITAGE DICTIONARY 1394 (2d ed. 1985).

on a surface: *write one's name.*"[19] Reducing this definition further, the term "inscribe" is defined as "[1] a. [t]o write, print, carve, or engrave (words or letters) on or in a surface. b. [t]o mark or engrave (a surface) with words or letters."[20] Taken together, these definitions in no sense suggest the electronic recordation process typified by the stenomask method of reporting.

The applicants' NSVRA exhibits in the evidentiary materials show that the stenomask method is a closed microphone dictation system in which a tape recorder is connected and a verbatim voice record of the proceedings is made.[21] The process of recording electronic impulses on a magnetic medium is distinct from that which is required by § 1503(c). In setting out the proficiency standards, § 1503(c) expressly limits the class of accepted methods to those that are "written." We are buttressed in this conclusion by the knowledge that, clearly, the legislature was aware of the stenomask method of reporting.[22] Had the legislature intended to include the stenomask method as one of the accepted reporting methods, it easily could have done so.

### B.

■ The applicants next assert that, because they do not rely exclusively upon the stenomask[23] but also employ auxiliary backup devices and take supplemental shorthand notes, there is a substantial issue of material fact sufficient to prevent summary judgment for the Board. Their

contention necessarily *implies* that 20 O.S. 1981 § 106.4(a) is a certification statute. To this notion we cannot accede.

Section 106.4(a) is not a certification statute. Rather, the subsection merely delineates the general responsibilities of court reporters and permits them to use, among other methods, the stenomask method of reporting and to use supplemental electronic devices in recording judicial proceedings.[24] While the subsection specifically proscribes the certification of shorthand reporters "who rely exclusively upon the stenomask for judicial proceedings," this does not mean that it authorizes the certification of shorthand reporters who *do not* "rely exclusively" upon the stenomask method of reporting. The negative does not *a fortiori* state the positive.[25] The most that may be said is that the subsection is permissive, in that, in carrying out their responsibilities, the subsection allows court reporters, within certain specified limits, to choose among alternative reporting methods. Ultimately, the *only implication* in the subsection's language is that it does not allow the certification of those "who rely exclusively upon the steno-mask for judicial proceedings."

### C.

Finally, in the same vein, the applicants contend that if the Board's position is correct—that is, § 106.4(a) recognizes that court reporters may employ the stenomask method, but § 1503(c) precludes CSR and LSR certification for stenomask report-

---

**19.** *Id.* at 1393 (signification 1 & 2).

**20.** *Id.* at 664 (signification 1).

**21.** *See supra* note 1.

**22.** Indeed, the terms of 20 O.S.1981 § 106.4(a) expressly recognize the stenomask method of reporting; *see supra* note 11 and accompanying text.

**23.** The terms of 20 O.S.1981 § 106.4(a), *supra* note 11, provide that *"[n]othing herein contained shall be construed to authorize the certification of persons as certified shorthand reporters who rely exclusively upon the steno-mask* for report-

ing judicial proceedings, except as provided by law...." (Emphasis added.)

**24.** *See id.*

**25.** Were we to follow the applicants' view, impermissible notions would have to be espoused. They argue in essence that, where a statute sets out a proscription, what is not prohibited is necessarily admitted. Under this view, a statutory proscription more than implies the opposite, but affirmatively sets out the opposite of what the statute proscribes. This construction, if followed, would imply a license from legislative silence.

ers—then this interpretation necessarily leads to the inconsistent result that noncertified stenomask reporters may be used to report judicial proceedings, but not to take depositions.

Section 106.4(a) neither acknowledges nor affirmatively sets out that noncertified stenomask reporters may be employed in reporting judicial proceedings. *The subsection merely provides that the stenomask method may be used in reporting judicial proceedings.* Further, the subsection does not identify the qualifications of a particular person nor whether a particular person is a stenomask or stenotype reporter. It simply states that certain methods of reporting may be used in judicial proceedings. There is nothing inconsistent about a CSR or a LSR reporter using either the stenotype or the stenomask reporting method in judicial proceedings.[26]

■ Given this analysis, we hold that, within the purview of 20 O.S.1981 § 1503, the stenomask use is not an accepted method[27] to demonstrate proficiency in court reporting and that, under the statutory language of the section, the Board's denial of the applications was authorized by law.

26. We are not unmindful of the statutory preferences given to CSR and LSR court reporters, see 20 O.S.1981 § 106.3B(e), *supra* note 3. This does not mean that noncertified stenomask reporters are necessarily barred from the court reporting function in judicial proceedings.

27. Inasmuch as we hold that the stenomask method does not meet the proficiency standards of 20 O.S.1981 § 1503(c), *supra* note 4, it follows that one who holds a certificate or a license from another state as a stenomask reporter does not meet the reciprocity test of 20 O.S.1981 § 1504(b), *supra* note 5.

28. The Equal Protection Clause of the 14th Amend., § 1, U.S. Const., commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." *Nordlinger v. Hahn,* 505 U.S. ——, ——, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992).

29. Although the Oklahoma Constitution does not include an equal protection clause like that found in its federal counterpart, this court has identified a functional equivalent of that clause in the anti-discrimination component of our state constitution's due process section, Art. 2, § 7, Okl.Const. The terms of § 7 are:

## III

## CONSTITUTIONALITY OF THE CERTIFICATION STATUTES

The applicants assert that if the Board's construction of the certification statutes is correct, then the statutes contravene (a) the Equal Protection Clause of the 14th Amend., U.S. Const.,[28] as well as the equal treatment notions embodied in our own constitution,[29] (b) the due process clauses of both the Oklahoma and the U.S. Constitutions[30] and (c) the state constitutional prohibition against special laws.[31]

### A.

### EQUAL PROTECTION CHALLENGE

■ The Equal Protection Clause, although not an absolute guarantee of equality of operation or application of state legislation, is intended to safeguard the quality of governmental treatment against arbitrary discrimination. Legislative action which sets apart any class without a rational basis for doing so offends this clause. Legislatures are generally "presumed to have acted within their constitutional power despite the fact that, in practice, their

"No person shall be deprived of life, liberty, or property, without due process of law."
*See Fair School Finance Council v. State,* Okl., 746 P.2d 1135, 1148 n. 48 (1987); *Personal Loan & Finance Co. v. Oklahoma Tax Com'n,* Okl., 437 P.2d 1015, 1019 (1968); *McKeever Drilling Co. v. Egbert,* 170 Okl. 259, 40 P.2d 32, 35 (1935).

30. Art. 2, § 7, Okl.Const., *supra* note 29; Amend. 14, § 1, U.S. Const., *supra* note 28. Our due process clause "has a definitional sweep that is coextensive with its federal counterpart." *Fair School Finance Council, supra* note 29 at 1148; *Matter of Rich,* Okl., 604 P.2d 1248, 1250–1251 (1979); *McKeever Drilling Co., supra* note 29, 40 P.2d at 35. *See Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972) (citing *Baldwin v. Hale,* 68 U.S. (1 Wall.) 223, 17 L.Ed. 531 (1864) and *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)).

31. The terms of Art. 5, § 59, Okl.Const., provide:

"Laws of a general nature shall have a uniform operation throughout the State, and where a general law can be made applicable, no special law shall be enacted."

laws result in some inequality." [32] "[U]nless a classification warrants some form of heightened review because it jeopardizes the exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification *rationally further* a legitimate state interest." [33]

When challenged on equal protection grounds, the cluster of interests in state licensing of professionals is not *per se* viewed as a fundamental right which demands strict scrutiny. [34] Nor are court reporters embraced within a "suspect" class for purpose of equal protection analysis. [35] Because neither a fundamental right nor a suspect classification is implicated in this case, the rational-basis test must be applied. Under this standard of review the challenged legislation will pass constitutional muster if it has a rational connection with the applicant's fitness for the occupation. [36]

In the area of equal protection challenges to economic legislation, [37] the ju-

---

**32.** *Nordlinger, supra* note 28, 505 U.S. at ——, 112 S.Ct. at 2331, quoting from *McGowan v. Maryland,* 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). As a general principle of law, the legislature is presumed to have acted in a constitutional manner. Indeed, we are required to presume—until the contrary is shown—that the legislature intended to comply with the limitations of the constitution. *Oklahoma City News Broadcasters Ass'n v. Nigh,* Okl., 683 P.2d 72, 75 (1984); *Black v. Ball Janitorial Serv., Inc.,* Okl., 730 P.2d 510, 512 (1986); *T.I.M. Co. v. Oklahoma Land Title Ass'n.,* Okl., 698 P.2d 915, 920 (1985); *Kimery v. Pub. Serv. Co.,* Okl., 622 P.2d 1066, 1069 (1980); *Rath v. LaFon,* Okl., 431 P.2d 312, 314 (1967); *City of Duncan v. Bingham,* Okl., 394 P.2d 456, 462 (1964); *Application of Oklahoma Turnpike Authority,* Okl., 365 P.2d 345, 355 (1961); *Jack v. State,* 183 Okl. 375, 82 P.2d 1033, 1036 (1938).

**33.** *Nordlinger, supra* note 28, 505 U.S. at ——, 112 S.Ct. at 2331–2332 (emphasis added), citing *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439–441, 105 S.Ct. 3249, 3254–3255, 87 L.Ed.2d 313 (1985) and *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).

*Dow Jones & Co. v. State ex rel. Tax Com'n,* Okl., 787 P.2d 843, 846 n. 19 (1990), notes that the "rational basis test is generally applied where a statute burdens neither a fundamental interest (like free speech) nor a suspect class. Under this standard, a statute will be upheld unless the varying treatment of the different groups is so unrelated to the achievement of any combination of legitimate state purposes that one can only conclude the classifications are irrational." In *Dow Jones* strict scrutiny was the appropriate standard because the challenged sales and use tax scheme constituted an impermissible burden on rights protected by the First Amendment to the U.S. Constitution. *See McDonald v. Time-DC, Inc.,* Okl., 773 P.2d 1252, 1257 n. 23 (1989); *T.I.M., supra* note 32 at 920; *Black, supra* note 32 at 513 n. 8; *Pennell v. City of San Jose,* 485 U.S. 1, 14, 108 S.Ct. 849, 859, 99 L.Ed.2d 1 (1988).

**34.** A fundamental right is one of a uniquely personal nature, e.g., the right to vote, the right of interstate travel and rights guaranteed by the First Amendment. For an inclusive list of constitutionally protected fundamental rights, see 2 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW § 15.7 at 427–436 (2nd Ed. 1992). *The applicants do not allege a violation of any fundamental right.*

**35.** A suspect class is one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973).

**36.** *Konigsberg v. State Bar of California,* 366 U.S. 36, 52, 81 S.Ct. 997, 1007, 6 L.Ed.2d 105 (1961); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957).

**37.** In *Nigh, supra* note 32 at 75, we noted that legislative power knows almost no limits in the area of economic legislation. Although *Nigh* dealt specifically with legislative expenditures, the genre of economic legislation nonetheless applies. *See Kadrmas v. Dickinson Pub. Schools,* 487 U.S. 450, 462, 108 S.Ct. 2481, 2490, 101 L.Ed.2d 399 (1988) (the Court applied the rational-basis test to uphold a statutory scheme that gives school boards the option to charge user fees for bus service); *Cleburne, supra* note 33, 473 U.S. at 440, 105 S.Ct. at 3254; *Hodel v. Indiana,* 452 U.S. 314, 331–32, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981) (prime farmland provisions of Surface Mining Control and Reclamation Act are held rationally related to legitimate governmental purpose); *Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981) (the Court upheld on the rational-basis standard federal legislation which excludes from social security benefits nonMedicaid recipients institutionalized in public mental institutions); *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 312–15, 96 S.Ct. 2562, 2566–2568, 49 L.Ed.2d 520 (1976).

diciary extends great deference to the legislature's judgment.[38] Deferential review is grounded in part on the view that line-drawing is an inevitable aspect of the legislative function [39] and that "even improvident decisions will eventually be rectified by the democratic processes." [40] These rationales are seen as a sufficient justification for the adoption of a deferential standard of review [41] where the rational-basis test applies.[42] Against this standard, we must assess whether the certification statutes are "arbitrary, capricious, irrational," [43] or "wholly irrelevant to the achievement of the State's objective" [44]—i.e., to the applicants' fitness for the profession of certified or licensed shorthand reporter.[45]

The Equal Protection Clause does not demand for purposes of rational-basis review that a legislature actually articulate the purpose or rationale supporting its classification.[46] This court will hypothesize reasons for the law's enactment if the legislature fails to do so.[47] It is apparent

**38.** *Nigh, supra* note 32, 683 P.2d at 75; *Black, supra* note 32 at 512; *T.I.M. Co., supra* note 32 at 920; *Kimery, supra* note 32 at 1069; *Rath supra* note 32 at 314; *Bingham, supra* note 32 at 462; *Turnpike Authority, supra* note 32 at 355; *Jack, supra* note 32, 82 P.2d at 1036.

**39.** The search for a rational basis is to be made in "awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary." *Murgia, supra* note 37, 427 U.S. at 314, 96 S.Ct. at 2567; *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970); *Schweiker, supra* note 37, 450 U.S. at 234–235, 101 S.Ct. at 1082–1083; *Fleming v. Baptist General Convention,* Okl., 742 P.2d 1087, 1097 (1987).

**40.** *Cleburne, supra* note 33, 473 U.S. at 440, 105 S.Ct. at 3254.

**41.** *See, e.g., Fleming, supra* note 39 at 1097.

**42.** For an extensive list of the variable equal protection standards, see, e.g., *Cleburne,. supra* note 33, 473 U.S. at 440–41, 105 S.Ct. at 3254–3255; *Murgia, supra* note 37, 427 U.S. at 312 n. 3 and n. 4, 96 S.Ct. at 2566.

**43.** *See, e.g., Kadrmas, supra* note 37, 487 U.S. at 463, 108 S.Ct. at 2490; *Cleburne, supra* note 33, 473 U.S. at 446, 105 S.Ct. at 3258; *Texas Oklahoma Express v. Sorenson,* Okl., 652 P.2d 285, 291 (1982).

**44.** *Kadrmas, supra* note 37, 487 U.S. at 462, 108 S.Ct. at 2490; *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942–943, 59 L.Ed.2d 171 (1979); *Pennell, supra* note 33, 485 U.S. at 14, 108 S.Ct. at 859; see also *McDonald, supra* note 33 at 1257; *Black, supra* note 32 at 513 n. 8; *Cascio v. State ex rel. Dept. of Pub. Safety,* Okl., 686 P.2d 282, 284 (1984); *Wilson v. Foster,* Okl., 595 P.2d 1329, 1332 (1979).

**45.** The state may exclude from professional practice those who are not qualified to hold a professional license. *See, e.g., Konigsberg, supra* note 36, 366 U.S. at 52, 81 S.Ct. at 1007; *Schware, supra* note 36, 353 U.S. at 239, 77 S.Ct. at 756. In *Dent v. West Virginia,* 129 U.S. 114, 122, 9 S.Ct. 231, 233, 32 L.Ed. 623 (1889), the Court stated that "[t]he power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will ... tend to secure them against the consequences of ignorance and incapacity as well as deception and fraud." The qualifications placed on the license of a professional must hence be rationally related to the profession and attainable by reasonable study or application. *Id.,* 129 U.S. at 122, 9 S.Ct. at 233 (physician's license); *cf. Theard v. United States,* 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957) (lawyer's license). Courts have looked with increasing favor on measures designed to ensure an acceptable level of competency in licensed professionals. *See, e.g., Marrese v. Intequal,* 748 F.2d 373 (7th Cir.1985), cert. denied, 472 U.S. 1027, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985) (physicians' peer review).

**46.** *Nordlinger, supra note* 28, 505 U.S. ——, 112 S.Ct. at 2334; *United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980); *McDonald v. Board of Election Comm'rs of Chicago,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969) (a legitimate state purpose may be ascertained even when the legislative or administrative history is silent).

**47.** *T.I.M., supra* note 32 at 920; *Williamson v. Lee Optical Co.,* 348 U.S. 483, 490, 75 S.Ct. 461, 465–466, 99 L.Ed. 563 (1955). In this case hypothesizing is unnecessary. The Board's brief lists four possible rationales upon which the legislature reasonably could have acted:

"1. Steno-mask reporters are not as well trained as steno-type reporters thus allowing for potentially less qualified reporters to hold out as 'certified shorthand reporters.'
2. Since steno-mask relies exclusively upon a tape recorder, a machine malfunction, (*i.e.,* tape failure, accidental eraser, etc.), may go unnoticed by the reporter until transcription is attempted.

that the certification statutes set out a classification scheme based on the reporters' relative proficiency skills. It is equally manifest that the impact of this design discriminates against stenomask reporters in favor of stenotype reporters.[48] *A classification is not to be measured by whether it discriminates, but rather by whether it discriminates impermissibly or invidiously.*[49] Where a legitimate state purpose is achieved *via* a statutory means that does not violate the relatively relaxed standard of minimal rationality, the classification scheme passes constitutional muster.

 It is evident that the concern for qualified court reporting in the judicial system is a legitimate state purpose. Part and parcel of ensuring this objective is the preservation of a system that can deliver highly competent and highly skilled court reporters. It cannot be contended with any show of reason that, in furthering this legitimate objective, the legislature overstepped its constitutional authority by prescribing the qualifications for enrollment as a certified shorthand reporter. All that is required to satisfy minimal rationality is that "the legislature *could conceivably have believed* that such a ... [statutory classification] would serve the legitimate purpose"[50] of ensuring the fitness of applicants for the profession of court reporting for the district courts. The extent to which the legislature may have failed to assess

optimally the relative differences between stenomask and stenotype reporters is not dispositive. Stated differently, suffice it to say that "the equal protection obligation ... is not an obligation to provide the best governance possible."[51] Acknowledging, as we must, the presumptive validity of legislative enactments[52] coupled with the well-settled rule that courts do not sit as "superlegislature[s],"[53] we cannot say that the classification scheme is so irrational as to fail our constitutional scrutiny.

B.

## DUE PROCESS CHALLENGE

The applicants argue that the certification statutes contravene the due process guarantees of the state[54] and the federal constitutions. In effect, they raise both a substantive and a procedural challenge to § 1503.

### Substantive Due Process Challenge

 The applicants' substantive due process challenge requires little discussion. Like the Equal Protection Clause, "it is, by now, absolutely clear that the Due Process Clause does not empower the judiciary to sit as a superlegislature to weigh the wisdom of legislation."[55] In the area of economic legislation, substantive due process

---

3. Reporting by the steno-mask method does not produce a concurrent 'hard copy' of the proceedings and testimony thus making it more difficult to read back prior testimony during the proceedings.
4. The steno-mask method of reporting can be distracting to the Judge and attorneys involved in the proceeding."

48. *Cleburne, supra* note 33, teaches that, in the area of equal protection, we must ask certain basic questions: "What class is harmed by the legislation.... What is the public purpose that is being served by the law? What is the characteristic of the disadvantaged class that justifies the disparate treatment?" *Id.,* 473 U.S. at 452–54, 105 S.Ct. at 3261 (Stevens, J., concurring).

49. *See, e.g., Cascio, supra* note 44 at 284; *Texas Oklahoma Express, supra* note 43 at 291.

50. *Kadrmas, supra* note 37, 487 U.S. at 465, 108 S.Ct. at 2491.

51. *Schweiker, supra* note 37, 450 U.S. at 230, 101 S.Ct. at 1080.

52. *See supra* note 32.

53. *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). *See also Schweiker, supra* note 37, 450 U.S. at 234, 101 S.Ct. at 1082–1083; *Ferguson v. Skrupa,* 372 U.S. 726, 731–32, 83 S.Ct. 1028, 1031–1032, 10 L.Ed.2d 93 (1963)

54. Oklahoma's due process clause is coextensive with its federal counterpart. *See supra* note 30.

55. *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978); *New Orleans, supra* note 53, 427 U.S. at

challenges, similar to equal protection contests, are also assessed against a rational-basis standard of review.[56] Given our rational-basis analysis in Part III(A), *supra,* we have no difficulty in concluding that § 1503 meets minimal rationality and does not contravene the mandate of substantive due process.[57]

### Procedural Due Process Challenge

■ Under the due process clauses of the federal and state constitutions, a procedural due process challenge first requires the existence of either a fundamental right[58] or a constitutionally protected "property or liberty" interest. We first consider the applicants' putative property interest.

The U.S. Supreme Court in *Board of Regents v. Roth*[59] enunciated the test for ascertaining the existence of a property interest. *Roth* states that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He

must, instead, have a legitimate claim of entitlement to it."[60] Moreover, whether one has an entitlement depends on "existing rules or understandings that stem from an independent source such as state law...."[61] Where, as here, the applicants neither advance a statutorily based[62] nor a governmentally derived entitlement, nor do they tender an employment agreement or any other assurances of continual employment,[63] there is *no* constitutionally protected property interest under the due process clause of either the Oklahoma or the United States Constitution.

Though more extensive than the range of constitutionally protected "pure" property interests, the boundaries of shielded liberty interests are not limitless.[64] Were we concerned with the denial of an initial license, where that denial would preclude both public and private occupational opportunities, perhaps a different analysis would apply.[65] But where, as here, *we are concerned merely with one's quest for enrollment* as a certified shorthand reporter and but a limited area of one's occupational opportunity is circumscribed—the taking of deposi-

---

303, 96 S.Ct. at 2515–2517; *Ferguson, supra* note 53, 372 U.S. at 731–32, 83 S.Ct. at 1032.

**56.** *Duke Power Co. v. Carolina Environ. Study,* 438 U.S. 59, 83–84, 98 S.Ct. 2620, 2635–2636, 57 L.Ed.2d 595 (1978), notes that economic legislation also comes to the Court with a presumption of constitutionality and that to demonstrate a due process violation, the complaining party must " 'establish that the legislature has acted in an *arbitrary and irrational way.*' " *Id.* (citations omitted) (emphasis added). There, the Court concludes that the Price–Anderson Act which imposed limitations on liability for nuclear accidents passed constitutional muster under a rational-basis analysis. *Id. See T.I.M., supra* note 32 at 920; 2 ROTUNDA & NOWAK, *supra note 34,* § 15.4 at 414.

**57.** Substantive due process review is "the judicial determination of the compatibility of the substance of a law or governmental action with the Constitution. The Court is concerned with the constitutionality of the underlying rule rather than with the fairness of the process [procedural due process] by which the government applies the rule to an individual." 2 ROTUNDA & NOWAK, *supra* note 34, § 14.6 at 356.

**58.** For an inclusive list of constitutionally protected fundamental rights, see 2 ROTUNDA & NOWAK, *supra* note 34, § 15.7 at 427–436.

**59.** 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**60.** *Roth, supra* note 59, 408 U.S. at 577, 92 S.Ct. at 2709.

**61.** *Roth, supra* note 59; *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 229, 106 S.Ct. 507, 515, 88 L.Ed.2d 523 (1985) (Powell, J., concurring).

**62.** Oklahoma jurisprudence establishes that a statutorily based entitlement constitutes a protected property interest. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Getty Oil Co.,* Okl., 782 P.2d 915 (1989).

**63.** Absent both a contractual agreement and any assurances of continual employment, the applicants can find no haven in the U.S. Supreme Court's jurisprudence applicable to governmental employment. *See* 2 ROTUNDA & NOWAK, *supra* note 34, § 17.5 at 635–637.

**64.** For example, U.S. Supreme Court constitutional jurisprudence affecting governmental employment applies the same analysis for property interests. *See* 2 ROTUNDA & NOWAK, *supra* note 34, § 17.4 at 621.

**65.** *See* 2 ROTUNDA & NOWAK, *supra* note 34, § 17.4, at 620.

tions [66]—no deprivation of a constitutional dimension is implicated. Moreover, stenomask reporters, while not given the same statutory preference as CSR and LSR reporters for employment by the courts, are still eligible for appointment when no certified or licensed court reporter is available.[67]

## C.

## PROHIBITION AGAINST SPECIAL LAWS

The applicants also assert that the certification statutes contravene the Oklahoma Constitution's prohibition against "special laws".[68] Under Art. 5, § 59, Okl. Const., a special law is permissible where a general law is inapplicable. In assessing whether a statute is constitutionally permissible, we must apply a three-prong inquiry: (1) Is the statute a special or general law? (2) If the statute is a special law, is a general law applicable? and (3) If a general law is not applicable, is the statute a permissible special law? [69]

We noted in Part III(A) that the certification statutes' classification scheme disparately treats otherwise similarly situated court reporters. The overall structure of 20 O.S.1981 § 1503 encompasses, as a class, court reporters who are differentiated into subclasses based on their relative technical skills, that is, the proficiency standards of § 1503(c).[70] Where a statutory classification permissibly distinguishes between two subclasses within a general

class, it cannot be controverted that the statute constitutes a special law.[71]

The second prong requires us to determine whether "the legislation is reasonably susceptible of general treatment or if ... there is a special situation possessing characteristics impossible of treatment by general law." [72] It is at this point that our inquiry ends.

The entire thrust of § 1503 is to provide discernible and objective criteria for one's enrollment as a certified court reporter. The challenged certification statutes are indistinguishable from other statutory schemes designed to provide standards that govern a given profession.[73] Like the myriad of areas within the legislature's competence, the proficiency requirements of § 1503 are a necessary aspect of protecting the public weal. They merely reflect the essence of the legislative process: line-drawing is an inevitable attribute of the legislative function.[74] It simply is not possible to differentiate between the qualified and the unqualified within the framework of a general law. In sum, though applicable to but a single occupation, § 1503 does not violate Art. 5, § 59, Okl.Const.

## SUMMARY

We hold that the Board did not err in denying the applicants' quest for enrollment as certified shorthand reporters and that the challenged certification statutes pass constitutional muster.

Summary judgment is accordingly affirmed.

---

**66.** For the terms of 12 O.S.Supp.1986 § 3205, see *supra* note 3 and the accompanying text.

**67.** For the pertinent terms of 20 O.S.1981 § 106.3B(a), see *supra* note 3.

**68.** For the terms of Art. 5, § 59, Okl.Const., see *supra* note 31.

**69.** *Reynolds v. Porter,* Okl., 760 P.2d 816, 822 (1988).

**70.** For the terms of 20 O.S.1981 § 1503, see *supra* note 4.

**71.** *See Reynolds, supra* note 69 at 822; *Jack, supra* note 32 at 1035–1036; *Grable v. Childers,*

176 Okl. 360, 56 P.2d 357, 360 (1936); *Guthrie Daily Leader v. Cameron,* 3 Okl. 677, 41 P. 635, 639 (1895).

**72.** *Reynolds, supra* note 69 at 822.

**73.** An obvious example is the practising bar. It cannot be seriously contended that one could merely attend an accredited school of law and, without meeting the statutory licensing requirements, establish a legal practice. *See* 5 O.S.Supp.1989 Ch. 1, App. 5.

**74.** *See Murgia, supra* note 37, 427 U.S. at 314, 96 S.Ct. at 2567; *Schweiker, supra* note 37, 450 U.S. at 230, 101 S.Ct. at 1080–1081. *See also* text at *supra* note 32.

LAVENDER, V.C.J., and HARGRAVE, ALMA WILSON, SUMMERS and WATT, JJ., concur;

SIMMS and KAUGER, JJ., concur in part and dissent in part;

HODGES, C.J., dissents.