Dear Chairman Apple,
¶ 0 This office has received your request for an Attorney General Opinion. You have asked, in effect, the following questions:
1. Does Section 139.103(D)(2) of Title 17 of the OklahomaStatutes, which prohibits certain rate reviews of certain localexchange telecommunications service providers by the CorporationCommission, on its face violate Article V, § 51 of the OklahomaConstitution, which prohibits laws granting exclusive rights,privileges or immunities to any individual, corporation orassociation?
 2. Does Section 139.103(D)(2) of Title 17 of the OklahomaStatutes, which prohibits certain rate reviews of certain localexchange telecommunications service providers by the CorporationCommission, violate Article V, § 59 of the Oklahoma Constitution,which prohibits special laws?
 3. Does Section 139.103(D)(2) of Title 17 of the OklahomaStatutes, which prohibits certain rate reviews of certain localexchange telecommunications service providers by the CorporationCommission, violate Article IX, § 35 of the OklahomaConstitution, which allows certain sections of the Constitutionto be amended if those amendments do not violate any otherconstitutional provisions?
 I. BACKGROUND
¶ 1 Section 139.103 is a part of the Oklahoma Telecommunications Act of 1997. It provides for adjustment of rates for certain sized telecommunications companies. Specifically, the section reads:
 A. Except as provided as follows, no company shall increase or decrease any regulated telecommunications service rate without approval of the Corporation Commission, consistent with Commission rules. . . .
. . . .
 D. Except as otherwise provided for in this subsection, nothing in this act shall be construed as abrogating any rate case settlement agreement approved by the Corporation Commission prior to the effective date of this act [July 1, 1997]. With respect to local exchange telecommunications service providers serving fifteen percent (15%) or more of the access lines in the state:
 1. The company shall not request and the Commission shall not approve an increase in basic local exchange service rates before February 5, 2001;
 2. The Commission shall not initiate or conduct a traditional rate base, rate of return or earnings proceeding for any such company before February 5, 2001, unless such company proposes and the Commission approves an increase in a service rate that results in an increase in overall revenues of more than five percent (5%) on an annual basis for that company, excluding rate changes made pursuant to [17 O.S. Supp. 1998, § 139.106[17-139.106]] and rate changes required or authorized by federal or state law, rules, orders or policies[.]
¶ 2 17 O.S. Supp. 1998, § 139.103[17-139.103]. When the Legislature passed the Oklahoma Telecommunications Act of 1997, it also provided that this section and others "are an amendment to, and alteration of, Sections 18,[1] 28,[2] and 34[3]
inclusive of Article IX of the Constitution of the State of Oklahoma" pursuant to authority vested in the Legislature by Section 35 of Article IX of the Oklahoma Constitution. 1997 Okla. Sess. Laws ch. 408, § 11.
 II. ARTICLE V PROVISIONS
A. Article V, § 51
¶ 3 You question the constitutionality of 17 O.S. Supp. 1998,§ 139.103[17-139.103] in relation to specific sections of the Oklahoma Constitution. The first reads:
 The Legislature shall pass no law granting to any association, corporation, or individual any exclusive rights, privileges, or immunities within this State.
Okla. Const. art. V, § 51.
¶ 4 This constitutional provision is designed to prevent the granting of exclusive rights and privileges and the creation of monopolies. Ex parte Sales, 233 P. 186 (Okla. 1924). It is intended to preserve equality between citizens who are similarly situated. Kimery v. Public Service Company of Oklahoma,622 P.2d 1066, 1071 (Okla. 1980).
¶ 5 In examining statutes as they pertain to Section 51 of Article V of the Oklahoma Constitution, the Oklahoma Supreme Court has applied an equal protection analysis. St. Paul Fire Marine Insurance Company v. Getty Oil Company, 782 P.2d 915, 922
(Okla. 1989). Consequently, in examining Section 139.103 under Article V, Section 51 of the Oklahoma Constitution, an equal protection analysis, as used by both the United States Supreme Court and the Oklahoma Supreme Court, is appropriate.
¶ 6 The standard of review used in an equal protection analysis varies according to the right or class involved. The most exacting standard is referred to as "strict scrutiny," which is used when "the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." St. Paul, 782 P.2d at 920
(quoting Massachusetts Board of Retirement v. Murgia,427 U.S. 307, 312, (1976)). The most lenient is the rational basis standard, used in situations where no such fundamental right or suspect classification exists. St. Paul, 782 P.2d at 921. The question to be answered under that standard is "whether the statute is rationally related to a legitimate government interest." Id.; Kimery, 622 P.2d at 1069-71. Because neither a fundamental right nor a suspect classification is implicated here, see Mistletoe Express Service v. United Parcel Service,674 P.2d 1, 9 (Okla. 1983), the rational-basis test is applied.Ross v. Peters, 846 P.2d 1107, 1115 (Okla. 1993).
¶ 7 The rational basis standard of review is a "paradigm of judicial restraint." F.C.C. v. Beach Communications,508 U.S. 307, 314 (1993).
 The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.
Id. (citation omitted).
¶ 8 This same philosophy was expressed in Oklahoma CountyUtility Services Authority v. Corporation Commission,519 P.2d 919, 921 (Okla. 1974):
 [C]ourts do not concern themselves as to whether an act of the Legislature is wholesome and salutary in its operation or whether such legislation is unwise and harmful. The judiciary can interfere with legislative action only when it clearly appears that a given act contravenes the basic law of the State and for that reason is unconstitutional and void.
Id.
¶ 9 The statute in question, which prohibits review by the Corporation Commission of local exchange telecommunications service providers serving fifteen percent (15%) or more of the access lines in the State, does not name any particular telecommunications company. In that way, it differs from the situation present in Guthrie Daily Leader v. Cameron, 41 P. 635
(Okla. 1895), where the Territorial Supreme Court, analyzing a territorial provision analogous to Article V, § 51, held void a law granting "[a]ll printing, binding, stereotyping and stationery of whatever character" to the "State Capital Printing Company of Guthrie, Oklahoma." Id. at 636. The Court held such a law granted an exclusive privilege to a particular company.Id. at 640.
¶ 10 But even if a particular company is named, that action by itself does not necessarily render a statute unconstitutional. InChilders v. West Publishing Company, 156 P.2d 809 (Okla. 1945), the Oklahoma Supreme Court analyzed a statute in which West Publishing was "authorized, empowered and directed to compile, codify and annotate the `Oklahoma Statutes, 1941,' according to specifications therein set forth, and the State Board of Affairs was authorized, empowered and directed to enter into a contract with said publishing company . . . for the purchase of two thousand volumes for distribution according to provisions of the Act," for which West would be paid. The Court found there was no violation of Article V, § 51 because the act contained no language which:
 [C]an be reasonably construed as granting the West Publishing Company an exclusive right or privilege, or any right or privilege which may not be exercised or enjoyed by any other publisher. The mere fact that it authorized the State Board of Affairs to purchase a limited number of volumes for the state does not characterize the legislation as granting an exclusive right or privilege. It contains no provision which makes the revised edition prepared by the West Publishing Company the only publication cognizable by the courts.
Id. at 810.
¶ 11 See also Oklahoma State Election Board v. Coats,610 P.2d 776 (Okla. 1980):
 Under this rationale, if a classification does not permit one to exercise the privilege while refusing it to another of like qualifications, under similar conditions and circumstances, it is unobjectionable. The classification must be neither arbitrary nor capricious, and it must bear a rational relationship to the objective sought to be accomplished. A classification is constitutional if there is a reasonable classification and reasonable opportunity for uniform or equal incidence on the class created.
Id. at 780.
¶ 12 The situation is analogous here. As with the legislation in Childers, the legislation here makes no provision granting one telecommunications company any exclusive right, nor does it make any one company the only one cognizable by the Corporation Commission. There is a reasonable opportunity for uniform treatment of everyone in the class. The legislation, on its face, does not grant any one company any exclusive rights, privileges, or immunities; it treats all in the class equally.
¶ 13 Here, the law appears "open-ended"; that is, the class embraced is available to any telecommunications service provider who attains service to 15 percent or more of the access lines in the State. By not restricting the possible number in the class, one impediment to constitutionality is removed. Cf. State exrel. Nesbitt v. District Court of Mayes County, 440 P.2d 700
(Okla. 1967). In Mayes County, the act in question provided in substance that the county attorney, county judge and sheriff of each county having an assessed valuation of at least $15,000,000 and a population of not less than 20,000 nor more than 20,400, as shown by the last census, would receive a specified monthly stipend from the court fund of that county for the performance of certain non-germane duties imposed in the act. This would be in addition to regular annual salaries fixed by general law. The Court declared the statute unconstitutional because the population and valuation classification was purely arbitrary.See also In re Bucher, 20 P.2d 150, 153-154 (Okla. 1933), where a 1921 statute setting a specific salary for "all counties in this State having a population not less than 37,499, and not more than 37,750, as shown by the last Federal census," was ruled unconstitutional on the ground the classification was "arbitrary and capricious."
¶ 14 It is possible a rational relationship exists for freezing and prohibiting review of rates of local exchange telecommunications service providers serving fifteen percent (15%) or more of the access lines in the State, while not prohibiting review of other local exchange telecommunications service providers. It is possible the Legislature intended that, due to the size of the providers affected and the number of people who could be affected, some temporary stability in the marketplace was necessary. "Where a legitimate state purpose is achieved via a statutory means that does not violate the relatively relaxed standard of minimal rationality, the classification scheme passes constitutional muster." Ross,846 P.2d at 1117. See also Citicorp Savings and Trust Company v.Banking Board of Oklahoma, 704 P.2d 490, 497 (Okla. 1985) (If there is a "conceivable rational basis for the difference in treatment," the statute is valid.). Therefore, on its face, Section 139.103 of Title 17 must be sustained under this constitutional provision.
¶ 15 There is an important caveat. Information provided to this office indicated only one telecommunications service provider fits into this category. There was no indication whether the class was so severely limited that this particular provider is the only one which can fit into the class; or whether there is a realistic possibility other such providers, through merger, acquisition or otherwise, could become eligible for the class. If reality renders this impossible, there is a very real possibility Section 139.103 of Title 17 violates Section 51 of Article V of the Oklahoma Constitution and is therefore unconstitutional. In any event, such questions are factually based, and therefore outside the scope of an Attorney General Opinion. 74 O.S. Supp.1998, § 18b[74-18b](A)(5). The answer to your query is based solely on the question of law presented, not on questions of fact which cannot be answered herein and are more properly reserved for a tribunal with the power to apply facts to the law. See, e.g.,Kinney v. Board of Tulsa County Commissioners, 894 P.2d 444
(Okla.Ct.App. 1995) (based in part on facts presented, appeals court declared unconstitutional a law which, on its face and in the absence of facts, had withstood a constitutional challenge). In the absence of facts which cannot be considered, this section is facially constitutional under Article V, § 51.
B. Article V, § 59
¶ 16 Special laws are generally prohibited by the Oklahoma Constitution. The applicable provision reads:
 Laws of a general nature shall have a uniform operation throughout the State, and where a general law can be made applicable, no special law shall be enacted.
Okla. Const. art. V, § 59.
¶ 17 The question therefore arises as to whether the Legislature, when it passed a statute which prohibits review by the Corporation Commission of basic local exchange service rates of any telecommunications service provider with fifteen percent or more of the access lines in the State, passed a special law which violates this portion of the Constitution.
¶ 18 In interpreting Article V, § 59, the Oklahoma Supreme Court has said that a statute which applies to all persons or things of a designated class uniformly throughout the State is a general law within the meaning of the Oklahoma Constitution.Mistletoe Express Service v. United Parcel Service, 674 P.2d 1,10 (Okla. 1983) In determining "whether an act is a general law as distinguished from a local or special law the answer . . . depends fundamentally on whether there is a proper and legitimate classification, and each case must be decided on its own merits."Elias v. City of Tulsa, 408 P.2d 517, 519 (Okla. 1965) (act passed which empowered a city of no less than 180,000 nor more than 240,000 population to zone territories lying within five miles of its boundaries. Based on the facts presented, the act applied to only one county, and in fact eliminated another county having a city with a population of 243,504. Held: the act provided for population classification which was arbitrary and subterfuge, and was therefore invalid as a "special" or "local" law). In other words, the question whether a statute violates this provision of the Oklahoma Constitution by creating a special law which applies only to geographic regions served by the local exchange telecommunications service providers with 15% or more of the access lines in the State boils down to a question of fact, which cannot be addressed in an Attorney General Opinion. 74O.S. Supp. 1998, § 18b[74-18b](A)(5).
 III. ARTICLE IX, § 35
¶ 19 You also contend the legislation in question violates another particular constitutional provision which reads:
 After the second Monday in January, nineteen hundred and nine, the Legislature may, by law, from time to time, alter, amend, revise, or repeal sections from eighteen to thirty-four,[4] inclusive, of this article, or any of them, or any amendments thereof: Provided, That no amendment made under authority of this section shall contravene the provisions of any part of this Constitution other than the said sections last above referred to or any such amendments thereof.
Okla. Const. art. IX, § 35 (emphasis added).
¶ 20 Therefore, although the Legislature has the power to amend, or even repeal, these sections without submitting them to a vote of the people, such amendments must not contravene any other section of the Oklahoma Constitution, either procedurally or substantively.
¶ 21 A provision of the Oklahoma Telecommunications Act of 1997 contains a section which reads:
 Pursuant to the authority vested in the Legislature by Section 35 of Article IX of the Constitution of the State of Oklahoma, the Legislature hereby expressly declares that Sections 2, 3, 6, 7 and 9 of this act are an amendment to, and alteration of,
Sections 18, 28 and 34 inclusive of Article IX of the Constitution of the State of Oklahoma.
1997 Okla. Sess. Laws ch. 408, § 11 (emphasis added).[5]
A. Logistics of Amending the Oklahoma Constitution
¶ 22 The first question presented is whether Sections 18, 28 and 34 of Article IX were "amended" or "altered." There is nothing indicating that the actual wording of these constitutional sections was amended by the Oklahoma Telecommunications Act of 1997. Rather, the amendment is indicated only by an annotation containing the above language, inserted by the publisher of Oklahoma statute books, which follows the constitutional sections published in those books.
¶ 23 The Oklahoma Supreme Court has defined the word "amend" as, "[t]o change for the better by removing defects or faults. To change, correct, revise, improve." In re Initiative Petition No.348, State Question No. 640, 820 P.2d 772, 775 n. 6 (Okla. 1991)quoting Black's Law Dictionary (abr. 5th ed. 1983). There was no "change" in the constitutional wording, nor was there any actual correction or revision to the language of the sections as they are contained in the Oklahoma Constitution.
¶ 24 The Oklahoma Constitution dictates that laws be enacted in a certain way:
 Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes; and no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred shall be re-enacted and published at length: Provided, That if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the laws as may not be expressed in the title thereof.
Okla. Const. art. V, § 57.
¶ 25 There does exist dicta indicating the constitutional amendments here violate Article V, § 57 of the Oklahoma Constitution. In Southwestern Bell Telephone Company v. OklahomaCorporation Commission, 897 P.2d 1116 (Okla. 1994), one concurring opinion said:
 Explicit legislation effectively repealing [Article 9,] § 21 would have to (a) identify the precise constitutional text intended to be displaced (stating unequivocally what § 21 provisions are supplanted by enactment) and (b) either provide textual replacement for the content of the cast-away provisions or expressly declare them extinguished in toto. Until the Legislature so explicitly amends § 21, that section's force as a constitutional command must stand undiminished.
 Judicial laxity in enforcing compliance with the strictures that govern the legislative process intended to effect constitutional changes would be much too costly for the symmetry of our legal system. In this case, for example, the terms of Art. 9, § 20, Okl. Const., the section that generally governs appeals from the Commission to this court, which were not replaced in any Art. I provisions of the APA, would be deemed to have been effectively extinguished by mere implication. Endorsing such a cavalier approach would place an imprimatur on constitutional repeal or amendment by implication — a doctrine expressly repudiated by this court's extant § 35 jurisprudence. This example alone
should make it abundantly clear that nothing in the Constitution can safely be cast aside by implication. Legislative amendment or repeal must explicitly and narrowly target the changes intended, leaving nothing to speculation or conjecture.
Id. at 1123 (Opala, J., concurring) (footnotes omitted).
¶ 26 This is consistent with older cases indicating constitutional amendments cannot be accomplished by implication.See Oklahoma Cotton Ginners' Association v. State, 51 P.2d 327,332 (Okla. 1935) ("It would seem that the Legislature, if it intended to amend the fundamental instrument on which the government of this state was erected, would have expressed itself in no uncertain terms as to the character of its action."). Seealso St. Louis-San Francisco Railway Company v. State,268 P.2d 845, 850 (Okla. 1953) (Reviewing past cases dealing with the Corporation Commission).
¶ 27 However, the Oklahoma Supreme Court as a whole explicitly rejected a challenge under Article V, § 57 in Mistletoe ExpressService v. United Parcel Service, 674 P.2d 1 (Okla. 1983). First, the Court reasoned that the constitutional provision, while applying to statutory enactments of the Legislature, does not apply to constitutional provisions because an enactment by the Legislature which amends Sections 18 through 34 of Article IX does not constitute an "act of the Legislature." Id. at 4. Furthermore, the only limitation imposed on constitutional amendments to Sections 18 through 34 of Article IX enacted by the Legislature is that the enactment "occur after the second Monday in January 1901." Id. Second, the Court held that the Legislature, by including a provision which by comparison is similar to the one found at Section 11 of the Oklahoma Telecommunications Act of 1997, had made a valid amendment to the applicable sections of the Oklahoma Constitution. Id. at 4-5.
¶ 28 Mistletoe Express is the most recent pronouncement by a majority of the Oklahoma Supreme Court on this issue. Based onMistletoe Express, Section 139.103(D) is not unconstitutional under Article 5, § 57.
B. Equal Protection Due Process
¶ 29 The Oklahoma Constitution provides:
 No person shall be deprived of life, liberty, or property, without due process of law.
Okla. Const. art. II, § 7.
¶ 30 "This section is designed to protect citizens from arbitrary and unreasonable action by the state." City of Edmondv. Wakefield, 537 P.2d 1211, 1213 (Okla. 1975). This provision has also been interpreted to be an equal protection clause.Oklahoma Association for Equitable Taxation v. City of OklahomaCity, 901 P.2d 800, 805 (Okla. 1995). The equal protection aspect of Article II, § 7 will be examined first.
1. Equal Protection
¶ 31 Section 139.103 of Title 17 prohibits the Corporation Commission from conducting any form of rate review on any service provider in the class until February 5, 2001. There is only one exception:
 [U]nless such company proposes and the Commission approves an increase in a service rate that results in an increase in overall revenues of more than five percent (5%) on an annual basis for that company,
excluding rate changes made pursuant to [17 O.S. Supp. 1998, § 139.106[17-139.106]] and rate changes required or authorized by federal or state law, rules, orders or policies[.]
17 O.S. Supp. 1998, § 139.103[17-139.103](D)(2) (emphasis added).
¶ 32 Dependent upon certain facts, Section 139.103 of Title 17 may violate the equal protection aspect of Article II, § 7. On its face, the statute provides that a rate review can in fact be triggered, but only by an act of the otherwise legislatively protected local exchange telecommunications service provider serving 15% or more of the access lines in the State, which requests for an increase in a service rate which results in a five percent increase in overall revenues. In contrast, acts of the public at large, the Corporation Commission,[6] or the Attorney General acting on behalf of the State's ratepayers (pursuant to 74 O.S. Supp. 1998, § 18b[74-18b](A)(20)) cannot trigger a rate review. In other words, the only way a rate review can be triggered is by an action of the otherwise sheltered local exchange telecommunications service provider(s).
¶ 33 Here, the members of the classes compared for purposes of an equal protection analysis are different than under the Article V, § 51 discussion, above. Here, the law divides those affected into two classes: the class of protected local exchange telecommunications service providers whose acts can trigger a rate review, and the utility consumer. Under 17 O.S. Supp. 1998,§ 139.103[17-139.103](D), only members of one of these classes can seek relief from the rate review freeze; the telecommunications companies can, under certain circumstances, seek a rate increase. In contrast, the other class — the utility consumer — cannot receive relief from the rate review freeze, no matter how much profit the telecommunications provider is earning. Despite the difference in the content of the classes from the analysis set forth above in the discussion of Article V, § 51, the same standard of review applicable there applies here as well: in a case where no suspect classification or fundamental right is involved, the question to be answered is "whether the statute is rationally related to a legitimate government interest," St.Paul, 782 P.2d at 920, keeping in mind that the rational basis standard is a "paradigm of judicial restraint." Beach,508 U.S. at 314. Additionally, a statutory classification will not be set aside if any state of facts reasonably may be conceived to justify it. Equitable Taxation, 901 P.2d at 806. See alsoRoss, 846 P.2d at 1117 ("All that is required to satisfy minimal rationality is that "the legislature could conceivably havebelieved that such a . . . [statutory classification] would serve the legitimate purpose."
¶ 34 Having said this, this equal protection analysis can go no further. Assuming for purposes of discussion there is a conceivable legitimate public purpose — such as assuring uninterrupted service to the consumer by a local exchange telecommunications service provider which is undergoing transition from being a monopoly to being in a competitive marketplace — there are a number of factually-based variables necessary to determine whether there is a rational basis for Section 139.103(D). For example, the telecommunications industry could be in a cost-declining mode — i.e., scientific advances are making industry technology so inexpensive that this savings offsets other rising costs. In a related vein, the currently charged rates of a local exchange telecommunications service provider now able to enjoy the shield from rate review provided by Section 139.103(D) could be based on the provider's costs and revenues in a year which is no longer representative of today's cost. The existence of these facts and others could influence a court's decision as to whether the rate case shield is rationally related to a legitimate State goal.
¶ 35 In other words, the outcome of an equal protection analysis here, even more than the above discussion, under Article V, § 51, is dependent on the introduction of facts. Such facts are outside the scope of an Attorney General Opinion. 74 O.S.Supp. 1998, § 18b[74-18b](A)(5).
2. Due Process
¶ 36 There are two aspects to due process: procedural due process and substantive due process. With regard to procedural due process: under the exception in Section 139.103(D) noted above, there is nothing prohibiting the Corporation Commission from receiving a request from a local exchange telecommunications service provider for an increase in a particular service rate, providing notice to all interested parties, and giving them an opportunity to respond under established Commission rules and procedures. Put another way, there is nothing which would prohibit the Commission from adhering to procedural guidelines which would afford all interested parties notice of the proposal and the opportunity to be heard. There is therefore no procedural due process problem. See New Motor Vehicle Board v. Orrin W. FoxCo., 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978) (state agency acting pursuant to state law prohibited introduction of a new automobile dealership within a specified area; Court held there was no procedural due process violation: it was the prohibition contained in the law, not the procedures used by the agency in following the law, that was at issue); see also Ross,846 P.2d at 1118, n. 57 ("Substantive due process review is `the judicial determination of the compatibility of the substance of a law or governmental action with the Constitution. The Court is concerned with the constitutionality of the underlying rule rather than with the fairness of the [procedural due] process by which the government applies the rule to an individual.'") (citation omitted).
¶ 37 However, that does not end the due process aspect. Under a substantive due process analysis, there is also the issue of fairness and reasonableness:
 If the ordinance in question deprived no one of constitutionally protected procedural rights, then [the Supreme Court] must concern itself with the issues of the basic fairness and reasonableness of the ordinance. In essence, substantive due process of law, independently of any procedural rights guaranteed by constitutional provisions, is the general requirement that all governmental actions have a fair and reasonable impact on the life, liberty, or property of the person affected. Arbitrary action is thus proscribed.
City of Edmond v. Wakefield, 537 P.2d 1211, 1213 (Okla. 1975). Such is the essence of substantive due process.
¶ 38 At the federal level, the concept of substantive due process as a restraint on business or economic regulation is seldom, if ever, used. See Williamson v. Lee Optical ofOklahoma, 348 U.S. 483, 488, (1955) ("The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought."). While the concept of substantive due process is appropriate at the state level,see, e.g., City of Edmond v. Wakefield, 537 P.2d 1211 (Okla. 1975) it does not apply here. A substantive due process analysis is used when a law is alleged to restrict the rights of all who are subject to it; an equal protection analysis is used when a law classifies those it affects. 2 Ronald D. Rotunda and John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 15.4 at 407 (2d ed. 1992). As discussed above, the law purports to classify those affected by it. Therefore, a substantive due process analysis based on that classification is inapplicable here. Rather, it is the equal protection component of Article II, § 7 which applies here.[7]
¶ 39 Consequently, because the equal protection analysis here is so heavily fact-dependent, it cannot be said as a matter of law whether Section 139.103 of Title 17 violates Article II, § 7
of the Oklahoma Constitution.
¶ 40 Article IX, § 35 of the Oklahoma Constitution allows modification of Article IX, §§ 18-34 only so long as the amendments do not violate another provision of the Constitution. Here, it cannot be said that the statute facially violates Article II, § 7. It does not violate Article V, § 57. Thus, it cannot be said that the legislation violates Article IX, § 35 of the Oklahoma Constitution.
¶ 41 It is, therefore, the official Opinion of the AttorneyGeneral that:
 1. Section 139.103(D)(2) of Title 17 of the Oklahoma Statutes,which prevents the Corporation Commission from reviewing certainrate aspects of the telecommunications industry, does not, onits face, violate Article V, § 51 of the Oklahoma Constitutionbecause the class is not restricted, and there is a rationalbasis for the Legislature's actions. Whether Section139.103(D)(2) would, under particular factual circumstances,constitute a violation of this constitutional provision isoutside the scope of an Attorney General Opinion. 74 O.S. Supp.1998, § 18b(A)(5).
 2. Whether 17 O.S. Supp. 1998, § 139.103(D)(2) of theOklahoma Statutes, which prevents the Corporation Commission fromreviewing certain rate aspects of the telecommunicationsindustry, violates Article V, § 59 of the Oklahoma Constitution,which prohibits special laws, is a question of fact which cannotbe answered in an Attorney General Opinion. 74 O.S. Supp. 1998,§ 18b(A)(5).
 3. Section 139.103(D)(2) of Title 17 of the Oklahoma Statutes,which prevents the Corporation Commission from reviewing certainrate aspects of the telecommunications industry, does not on itsface violate Article IX, § 35 of the Oklahoma Constitution whichallows Legislative changes to certain sections of the OklahomaConstitution so long as other constitutional provisions are notoffended. Whether 17 O.S. Supp. 1998, § 139.103(D)(2)violates the equal protection component of Article II, § 7 of theOklahoma Constitution is heavily dependent on facts, and cannotbe answered in an Attorney General Opinion. 74 O.S. Supp. 1998,§ 18b(A)(5).
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
DAN CONNALLY ASSISTANT ATTORNEY GENERAL
[1] Section 18 of Article IX reads in pertinent part:
 The Commission shall have the power and authority and be charged with the duty of supervising, regulating and controlling all transportation and transmission companies doing business in this State, in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses and preventing unjust discrimination and extortion by such companies; and to that end the Commission shall, from time to time, prescribe and enforce against such companies, in the manner hereinafter authorized, such rates, charges, classifications of traffic, and rules and regulations, and shall require them to establish and maintain all such public service, facilities, and conveniences as may be reasonable and just, which said rates, charges, classifications, rules, regulations, and requirements, the Commission may, from time to time, alter or amend. All rates, charges, classifications, rules and regulations adopted, or acted upon, by any such company, inconsistent with those prescribed by the commission, within the scope of its authority, shall be unlawful and void. The commission shall also have the right, at all times, to inspect the books and papers of all transportation and transmission companies doing business in this State, and to require from such companies, from time to time, special reports and statements, under oath, concerning their business[.]
Under this section, the Commission is also charged with prohibiting discrimination by public utility companies, and to give notice and hold hearings before rates are fixed.
[2] Section 28 of Article IX gives the Commission the power to "inspect the books and papers of any railroad company or other public service corporation, and to examine, under oath, any officer, agent, or employee of such corporations in relation to the business and affairs of the same." Refusal to do so can result in appropriate punishment.
[3] Section 34 of Article IX reads in pertinent part:
 As used in this Article, the . . . term "transmission company" shall include any company, receiver or other person owning, leasing or operating for hire any telegraph or telephone line; the term "freight" shall be construed to mean any property transported or received for transportation by any transportation company. The term "public service corporation" shall include all transportation and transmission companies, all gas, electric, heat, light and power companies, and all persons, firms, corporations, receivers or trustees engaged in said businesses, and all persons, firms, corporations, receivers or trustees authorized to exercise the right of eminent domain or having a franchise to use or occupy any right of way, street, alley or public highway, whether along, over or under the same, in a manner not permitted to the general public, and all persons, firms, corporations, receivers and trustees engaged in any business which is a public utility or a public service corporation, at the present time or which may hereafter be declared to be a public utility or a public service corporation. . . .
 The provisions of this Article shall always be so restricted in their application as not to conflict with any of the provisions of the Constitution of the United States, and as if the necessary limitations upon their interpretation had been herein expressed in each case.
[4] Sections 18 through 34 of Article IX deal with the Oklahoma Corporation Commission.
[5] Information provided to this office indicated that the legislation "intended the entire section to amend Sections 18 through 34 of Article IX." As shown by this quote, this is incorrect. The analysis will proceed with the correct wording.
[6] The Corporation Commission is placed here because it is a member of the class. However, from a purely legal standpoint, the Corporation Commission cannot avail itself of an equal protection argument, as "[s]ubstantive due process and equal protection guarantees run to `persons,' not the state." Carl v. Board ofRegents of University of Oklahoma, 577 P.2d 912, 915 (Okla. 1978). At first glance, this principle would seem to apply to the Attorney General as well. However, the Attorney General, when participating in utility rate cases, acts not to protect the State, but acts to protect the collective interest of utility consumers — consumers which are entitled to due process. Thus, in the absence of 17 O.S. Supp. 1998, § 139.103[17-139.103](D), the Attorney General could act on behalf of utility consumers.
[7] But even if it were applicable here, the same rational basis analysis used to decide equal protection arguments is used here. Ross, 846 P.2d at 1118 n. 56. As noted in the above discussion of the equal protection aspect of Article II, § 7, the existence of facts which are beyond the scope of an Attorney General's Opinion could influence a court's decision as to whether the rate case shield is rationally related to a legitimate State goal.